## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| INTERNATIONAL INSURANCE | ) | |
| BROKERS, LTD., L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-0082-CVE-SAJ |
| | ) | |
| TEAM FINANCIAL, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court are Defendant Team Financial, Inc.'s Motion to Dismiss the First Amended

Complaint (Dkt. # 57) and the Application of Defendants Mystic Capital Advisors Group, LLC and

Kevin Donaghue to Determine Defense of Lack of Personal Jurisdiction (Dkt. # 69).  Defendant

Team Financial, Inc. ("TFIN") incorporates its arguments pursuant to Fed. R. Civ. P. 12(b)(2),

12(b)(3), and 12(b)(6) presented in its motion to dismiss the original complaint (Dkt. # 35).  Thus,

although the motion to dismiss the original complaint (Dkt. # 35) is moot, see Dkt. # 64, the Court

examines that motion insofar as the arguments therein have been adopted in the pending motion to

dismiss the amended complaint.  In their "application," defendants Mystical Capital Advisors Group,

LLC ("Mystic") and Kevin Donaghue ("Donaghue") likewise incorporate their argument concerning

personal jurisdiction set forth in their motion to dismiss the original complaint (Dkt. # 36).

### I.

On February 7, 2005, International Insurance Brokers, Ltd., LLC ("IIB") entered into a Stock

Purchase Agreement (the "SPA") whereby defendant Team Bank, N.A. ("TBNA") agreed to sell to

IIB all of the issued and outstanding common stock of Team Insurance Group, Inc. ("TIG"), an

insurance company located in Oklahoma.  At the time of signing the SPA, TBNA wholly owned

TIG.[1]  The SPA includes several representations, warranties, and conditions which are, in part, the subject of this action.  It also includes a forum selection clause, which states:

> Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Oklahoma, County of Tulsa, or, if it has or can acquire jurisdiction, in the United States District Court for the Northern District of Oklahoma, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.  Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

Dkt. # 35, at 28.  Defendant Robert J. Weatherbie ("Weatherbie") signed the SPA as the President of TBNA.  IIB and TBNA are the only parties to the SPA.

As a condition precedent to signing the SPA, IIB required that defendant TFIN, which was and is the sole owner of all the issued and outstanding shares of TBNA, sign an Inducement Agreement  (the "Inducement Agreement").  See Dkt. # 35, Ex. C. Under the terms of the Inducement Agreement, TFIN represented and warranted to IIB that, at the time of the TIG stock sale from TBNA to IIB, TFIN would have no claims or demands against TIG.  The Inducement Agreement also contains, inter alia, a non-interference term, a confidentiality agreement, and a forum selection clause, which states:

> Any action or proceeding seeking to enforce any provisions of, or based on any right arising out of, this Agreement shall be brought against any of the Parties in the courts of the state of Kansas, County of Miami, or, if it has or can acquire jurisdiction, the United States District Court for the District of Kansas, sitting in Kansas City, Kansas, and each of the Parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding any waives any objection to venue laid therein.  Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere in the world.

---

[1]     TBNA acquired TIG, then known as The Quarles Agency, Inc., in December 2002.

Dkt. # 35, Ex. C., at 5.  Weatherbie signed the Inducement Agreement as the Chairman and Chief Executive Officer of TFIN.  The only parties to the Inducement Agreement are IIB and TFIN.

Mystic provides financial consulting services to the retail insurance, wholesale insurance, and financial services industries.  Mystic advised TBNA regarding the acquisition of TIG in 2002. In 2003 and 2004, Mystic prepared an annual valuation report and goodwill impairment analysis with respect to TIG.  When IIB contacted TBNA regarding the possible sale of TIG, Mystic advised TBNA in connection with that sale.  See Dkt. # 36, Ex. C, Kevin Donaghue Affidavit.  Donaghue, a Managing Director at Mystic, was the primary person responsible for advising TBNA regarding the TIG sale to IIB.

In the amended complaint, plaintiff alleges that TBNA breached the terms, conditions, and intent of the SPA.   IIB also brings a claim of fraud, misrepresentation, and fraudulent inducement against each of the defendants.  Specifically, IIB alleges that the defendants made false representations regarding TIG's premium trust account, the rate of commissions paid or to be paid by TIG, TIG's aggregate revenues, and the maintenance of relations and good will with suppliers, customers, and others having business relationships with TIG.  Lastly, IIB brings a claim of negligent misrepresentation with respect to each of the defendants.  See Dkt. # 44.

## II.

TFIN, Mystic, and Donaghue argue that the Court cannot exercise personal jurisdiction over them.  Section II(A) sets forth the general standard to assess motions to dismiss for lack of personal jurisdiction.  Section II(B) analyzes whether plaintiff has made a prima facie showing that the Court can exercise personal jurisdiction over TFIN; Section II(C) does the same as to Mystic and Donaghue.

**A.**

Plaintiff bears the burden of establishing that the Court has personal jurisdiction over each defendant.  OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998).  "When a district court rules on a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, . . . the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion."  Id. (citations omitted).  "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant."  Id. at 1091.  "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'"  Id.  (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

To demonstrate the existence of personal jurisdiction over a nonresident defendant in a diversity action, plaintiff must demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the United States Constitution.  See OKLA. STAT. tit. 12, § 2004(F).  "Because Oklahoma's long-arm statute permits the exercise of jurisdiction that is consistent with the United States Constitution, the personal jurisdiction inquiry under Oklahoma law collapses into the single due process inquiry." Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000) (citing Rambo v. Am. S. Ins. Co., 839 F.2d 1415, 1416 (10th Cir. 1988)); see also Hough v. Leonard, 867 P.2d 438, 442 (Okla. 1993).

"Due process requires that the nonresident defendant's conduct and connection with the forum state are such that the nonresident could reasonably anticipate being haled into court in that state." Conoco, Inc. v. Agrico Chem. Co., 115 P.3d 829, 835 (Okla. 2004) (citing World-Wide

4

Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).  "The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant 'so long as there exist minimum contacts between the defendant and the forum State.'"  Intercon, 205 F.3d at 1247  (quoting World-Wide Volkswagen, 444 U.S. at 291).  The existence of such minimum contacts must be shown to support the exercise of either general jurisdiction or specific jurisdiction.  A court "may, consistent with due process, assert specific jurisdiction over a nonresident defendant 'if the defendant has purposefully directed [its] activities at the residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.'"  Intercon, 205 F.3d at 1247 (quoting Burger King, 471 U.S. at 472).  "When a plaintiff's cause of action does not arise directly from a defendant's forum related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state."  Intercon, 205 F.3d at 1247 (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-16 & n.9 (1984)).

## B.

In examining whether the Court can exercise personal jurisdiction over TFIN, the Court analyzes TFIN's contacts with Oklahoma separately from those of TBNA.  IIB has not alleged or produced evidence that TBNA is the general agent or alter ego of TFIN.  In the absence of circumstances justifying disregard of the corporate entity, the Court must treat the parent company separately from the subsidiary in assessing whether a parent company and/or subsidiary has sufficient contacts with the forum state to establish personal jurisdiction.  See Benton v. Cameco Corp., 375 F.3d 1070, 1081 (10th Cir. 2004) (holding that the activities of the subsidiary in the forum state could not be attributed to the parent for the purpose of assessing the parent's general

business contacts with the forum state); cf. Pro Axess, Inc. v. Orlux Distribution, Inc., 428 F.3d 1270, 1278 (10th Cir. 2005) ("Companies conducting business through their subsidiaries can qualify as transacting business in a state, provided the parent exercises sufficient control over the subsidiary."); Curtis Publ'g Co. v. Cassel, 302 F.2d 132, 137 (10th Cir. 1962) ("[A] wholly owned subsidiary may be an agent and when its activities as an agent are of such a character as to amount to doing business of the parent, the parent is subjected to the in personam jurisdiction of the state in which the activities occurred."). As the Supreme Court explained, "jurisdiction over a parent corporation [does not] automatically establish jurisdiction over a wholly owned subsidiary." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984). The converse is equally true: jurisdiction over a wholly owned subsidiary does not automatically establish jurisdiction over a parent corporation. See Pro Axess, Inc., 428 F.3d at 1278 n.4 (noting that Keeton "concludes that a court may not automatically exercise jurisdiction over a parent corporation if the court may exercise jurisdiction over a subsidiary"). "Each defendant's contacts with the forum State must be assessed individually." Keeton, 465 U.S. at 781 n.13; see also Home-Stake Prod. Co. v. Talon Petroleum, 907 F.2d 1012, 1020 (10th Cir. 1990).

1.    General Jurisdiction

General jurisdiction is not related to the events giving rise to the suit. Therefore, "courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts" with the forum state. OMI, 149 F.3d at 1091. Factors relevant to whether contacts are "continuous and systematic" include:

> Whether the corporate defendant is:
> 1.    engaged in business in this state;
> 2.    licensed to do business in this state;
> 3.    owning, leasing, or controlling property [] or assets in this state;

6

4.    maintaining employees, offices, agents, or bank accounts in this state;
5.    present in that shareholders reside in this state;
6.    maintaining phone or fax listings within this state;
7.    advertising or soliciting business in this state;
8.    traveling to this state by way of salespersons, etc.;
9.    paying taxes in this state;
10.   visiting potential customers in this state;
11.   recruiting employees in the state;
12.   generating a substantial percentage of its national sales through revenue
      generated from in-state customers.

Soma Medical International v. Standard Chartered Bank, 196 F.3d 1292, 1295-96 (10th Cir. 1999).

Plaintiff contends that TFIN is subject to general jurisdiction in Oklahoma because: (1) TFIN

is listed on NASDAQ; (2) TFIN has shareholders across the United States; (3) TFIN provides debit,

credit card, and telephone banking services, and debit and credit card holders use ATMs in

Oklahoma which benefit TFIN; (4) TFIN attempted to buy a bank in Oklahoma; and (5) TFIN

previously maintained insurance policies in Oklahoma.  Dkt. # 45, at 17.  However, plaintiff failed

to submit evidence to counter the affidavit of Weatherbie, the Chairman and Chief Executive Officer

of TFIN, who has sworn to the following: (1) TFIN's principal place of business is in Kansas, and

it is incorporated in Kansas; (2) TFIN is not licensed to do business in Oklahoma; (3) TFIN does not

have any offices, employees, officers, or agents in Oklahoma; (4) TFIN does not travel to Oklahoma

by way of salespersons; (4) as of March 8, 2007, TFIN's records did not list any shareholders

residing in Oklahoma; (5) TFIN does not maintain any bank accounts in Oklahoma; (6) TFIN does

not pay taxes in Oklahoma; (7) TFIN does not solicit business in Oklahoma and does not generate

any revenue through activity in Oklahoma; and (8) TFIN does not own, lease, or control any real

or personal property in Oklahoma. See Dkt. # 35, Ex. A, Weatherbie Affidavit.  TFIN acknowledges

that it previously maintained insurance policies through an agent in Oklahoma.  Also, in 2002, it

engaged in discussions regarding the acquisition of a bank in Oklahoma; however, those discussions

7

did not result in TFIN's acquisition of an Oklahoma bank or any other contractual or continuing relationship with Oklahoma.  Id.

The Court finds that TFIN's contacts with Oklahoma are less continuous and systematic than such contacts in Helicopteros that the Supreme Court found to be insufficient for general jurisdiction. 466 U.S. at 416 (finding that a Texas district court could not exercise jurisdiction over a Colombian corporation that had sent its chief executive officer to Houston for contract negotiations; accepted into its New York bank accounts checks drawn on a Houston bank; bought equipment and training services from a Texas corporation; and sent personnel to that corporation's Texas facilities for training).  Plaintiff has failed to show that TFIN's limited and intermittent contacts with Oklahoma rise to the level of "continuous and systematic."  Accordingly, plaintiff has not made the prima facie showing needed for the exercise of general jurisdiction.

2.      Specific Jurisdiction

When alleged contacts fall short of being "continuous and systematic" so that the exercise of general jurisdiction would be unfair, those contracts may still support the exercise of specific jurisdiction if they are related to plaintiff's claims. World-Wide Volkswagen, 444 U.S. at 291-92. To prove sufficient contacts for the exercise of specific jurisdiction, plaintiff must demonstrate: that defendant has minimum contacts with the forum, thereby having purposefully availed itself of the benefits and protections afforded by Oklahoma laws; that the litigation arises out of or relates to those contacts; and that the exercise of jurisdiction is reasonable as it does not offend notions of fair play and substantial justice.  See id. at 297; Soma, 196 F.3d at 1298; OMI, 149 F.3d at 1091.

Here, although Weatherbie and defendant Michael L. Gibson[2] ("Gibson") traveled several times to Oklahoma to attend TIG board meetings prior to signing the SPA, it does not appear that they conducted this business on behalf of TFIN.  TBNA – not TFIN – wholly owned TIG and had the authority to sell TIG.  Most importantly, TFIN was not a party to the SPA.  Weatherbie signed the SPA in his capacity as the president of TBNA, and not in his capacity as the Chairman and Chief Executive Officer of TFIN.  Thus, Weatherbie's signing the SPA does not suggest that TFIN directed its activities at Oklahoma.  As emphasized above, the fact that TBNA established minimum contacts with Oklahoma does not automatically establish minimum contacts with respect to TFIN.

TFIN's contacts with Oklahoma appear to be limited to its email and phone communication with IIB concerning the Inducement Agreement, an agreement which is not the basis for this suit. Further, even if the Inducement Agreement were sufficiently related to the litigation for purposes of a personal jurisdiction analysis, the Court finds that TFIN's contacts with Oklahoma were insufficient to establish personal jurisdiction.   A contract between an out-of-state party and a resident of the forum state cannot, alone, establish sufficient minimum contacts with the forum state. Burger King, 471 U.S. at 473; see also Benton, 375 F.3d at 1077.  Relevant factors for assessing minimum contacts relating to a contract include "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Burger King, 471 U.S. at 479.  Here, in singing the Inducement Agreement, TFIN did not expect to "create continuing relationships and obligations" with citizens of Oklahoma. Id. at 473.   In fact, pursuant to the non-competition clause, TFIN agreed to refrain from business in Oklahoma for a certain time period.  Second, TFIN did not seek out IIB as a contractual partner.  IIB informed TBNA and TFIN

---

[2]        Gibson is the Chief Financial Officer of both TBNA and TFIN.

that the Inducement Agreement was a condition precedent to IIB's signing the SPA.  Finally, TFIN

did not expect that signing the Inducement Agreement would subject it to litigation in Oklahoma.

The Inducement Agreement contained a forum selection clause whereby any disputes arising out of

that agreement would be litigated in Kansas.  Thus, the Court finds that TFIN did not reasonably

expect to be haled into court in Oklahoma by signing the Inducement Agreement.  See World-Wide

Volkswagen, 444 U.S. at 297.

Because TFIN does not have the requisite minimum contacts with Oklahoma, the Court does

not reach the second part of the due process inquiry which involves the determination of whether

"the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and

substantial justice.'" OMI, 149 F.3d at 1091 (quotation omitted).  Also, because the Court does not

have general or specific jurisdiction over TFIN, the Court need not address TFIN'S argument

pursuant to Fed. R. Civ. P. 12(b)(6) or as to venue.

## C.

1.    General Jurisdiction

Plaintiff argues that both Mystic and Donaghue are subject to the general jurisdiction of this

Court because (1) Mystic was involved in advising TBNA on the acquisition of TIG in 2002 and

thus generated revenue through activity conducted in Oklahoma; (2) Mystic advertises on its website

its Oklahoma transactions with TBNA (both the acquisition of TIG and the sale of TIG to IIB) and

thus advertises in Oklahoma and solicits business in Oklahoma; (3) a Mystic employee (but not

Donaghue) visited Oklahoma for the purpose of conducting due diligence in behalf of TBNA in

connection with the acquisition of TIG in 2002; (4) in 2003 and 2004, Mystic prepared an annual

valuation report and goodwill impairment analysis with respect to TIG; and (5) Donaghue visited

Oklahoma on two occasions to meet with other insurance agencies of potential interest to TIG.  See

Dkt. # 45, at 21-22; Dkt. # 36, Ex. C, Donaghue Affidavit.  While it is undisputed that Mystic and

Donaghue have conducted some business in Oklahoma, their contact with Oklahoma is limited.

Mystic does not maintain offices, employees, officers, or agents in Oklahoma.  It does not maintain

any bank account in Oklahoma and does not own, lease, or control any real or personal property in

Oklahoma.  Mystic does not maintain any telephone or fax listings in Oklahoma.  Ultimately, the

Court finds that Mystic and Donaghue's contacts are not "substantial and continuous" to permit the

exercise of general jurisdiction.  Cf. Helicopteros, 466 U.S. at 416.

2.      Specific Jurisdiction

        In support of its argument that the Court may exercise specific personal jurisdiction over

Mystic and Donaghue, plaintiff provides the Court with telephone records indicating that Matthew

Coughlin, III ("Coughlin"), a managing member of IIB, made approximately 75 phone calls to

Donaghue between December 2004 and February 2005.  See Dkt. # 45, Ex. 1.  Further, Coughlin

estimates that Donaghue made in excess of thirty-five phone calls to him during that time.  Dkt. #

45, Ex. B, ¶ 8.  Plaintiff also attached a series of emails which were either sent from Donaghue to

IIB or vice versa based on Mystic's representation of TBNA in the sale of TIG to IIB.  See Dkt. #

45, Ex. 3.

        "[T]elephone calls and letters may provide sufficient contacts for the exercise of personal

jurisdiction." Rambo, 839 F.2d at 1418.  However, they are not necessarily sufficient in themselves

to establish minimum contacts.  Far West Capital, Inc. v. Towne, 46 F.3d 1071, 1077 (10th Cir.

1995).  In deciding whether such communications constitute the requisite contact for personal

jurisdiction, the Court must examine the nature of those communications.  It must determine whether

11

the calls and letters in question were made or sent in an effort by a defendant to purposefully avail itself of the privilege of conducting activities within the forum state.  Rambo, 839 F.2d at 1419.  To qualify as purposeful availment, contacts with a state must be attributable to the actions of a defendant and not solely to the actions of the plaintiff and typically must be the result of affirmative conduct by a defendant which allows or promotes business within the forum state.  See, e.g. Treierweiler v. Croxton and Trench Holding Corp., 90 F.3d 1523, 1543 (10th Cir. 1996).

Here, the Court finds that Mystic and Donaghue's telephone and email contact with IIB is insufficient to establish minimum contacts with Oklahoma.  IIB has made no showing that Mystic and Donaghue initiated the telephone and email communications as part of a specific or intentional effort to conduct business within Oklahoma.  Mystic and Donaghue did not attempt to solicit IIB or any other Oklahoma corporation's business through those telephone and email communications. Mystic and Donaghue's contact with IIB in Oklahoma was based solely on Mystic's role as an adviser to TBNA, a Kansas corporation.  Thus, Mystic and Donaghue sought the business of a Kansas, not Oklahoma, corporation.  Mystic and Donaghue should not have reasonably anticipated being haled into court in Oklahoma based on the fortuitous fact that TIG happened to be located in Oklahoma.

Further, neither Donaghue nor any other Mystic employee traveled to Oklahoma in connection with IIB's acquisition of TIG.  Although Donaghue and other Mystic employees have traveled to Oklahoma in previous years regarding TBNA's acquisition of TIG and regarding a possible future business acquisition for TIG, the claims in this litigation do not arise out of those contacts.  Without some other evidence that Mystic or Donaghue purposely availed themselves of the benefits and protection of Oklahoma law, the Court finds that their estimated thirty-five phone

12

calls and various emails to IIB are insufficient to establish personal jurisdiction.  See Far West, 46

F.3d at 1077 (scattered phone calls and faxes to forum state were insufficient to establish minimum

contacts); Soma, 196 F.3d at 1298-99 (holding that British bank's actions in sending faxes, written

communications, and wire transfers to a corporation located in Utah were insufficient to establish

specific personal jurisdiction over the bank in Utah where the corporation made the unilateral

decision to conduct business with the British bank and Utah had only fortuitous role in parties'

relationship).  As in Section II(B), the Court need not turn to the second part of the due process

inquiry concerning traditional notions of fair play and substantial justice.

### III.

**IT IS THEREFORE ORDERED** that Defendant Team Financial, Inc.'s Motion to Dismiss

the First Amended Complaint (Dkt. # 57) is **granted in part**.  It is granted insofar as the Court

cannot exercise personal jurisdiction over defendant Team Financial, Inc.; hence, plaintiff's claims

against defendant Team Financial, Inc. are hereby **dismissed without prejudice**.

**IT IS FURTHER ORDERED** that Application of Defendants Mystic Capital Advisors

Group, LLC and Kevin Donaghue to Determine Defense of Lack of Personal Jurisdiction (Dkt. #

69) is hereby **granted**.  The Court cannot exercise personal jurisdiction over defendants Mystic

Capital Advisors Group, LLC and Kevin Donaghue.  The Court hereby **dismisses without**

**prejudice** plaintiff's claims against defendants Mystic Capital Advisors Group, LLC and Kevin

Donaghue.

**IT IS FURTHER ORDERED** that defendants Team Financial, Inc., Mystic Capital

Advisors Group, LLC, and Kevin Donaghue are **terminated** from this action.   The remaining

defendants are Team Bank, N.A., Robert J. Weatherbie, and Michael L. Gibson.

**DATED** this 29th day of June, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT